SECURITIES AND EXCHANGE COMMISSION, Appellant,

v.

Frank CSAPO.

No. 74–1947.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 31, 1975.

Decided April 5, 1976.

David Ferber, Sol., Securities and Exchange Commission, Washington, D. C., with whom Richard E. Nathan, Asst. Gen.

Counsel, Securities and Exchange Commission, Washington, D. C., was on the brief, for appellant.

Peter Kolker, Washington, D. C., for appellee; Sidney Feldshuh, New York City, was on the brief.

Before LUMBARD,* Senior Circuit Judge, and WRIGHT and WILKEY, Circuit Judges.

Opinion for the court filed by Senior Circuit Judge LUMBARD.

LUMBARD, Senior Circuit Judge:

The Securities and Exchange Commission appeals from an order of the district court conditioning enforcement of the SEC's subpoena of respondent Frank Csapo upon Csapo's right to be accompanied by the attorneys of his choice—Sidney Feldshuh and Paul Chernis—while he was questioned by the Commission staff. At issue is the standard by which a district court should evaluate the propriety of the Commission's application of its duly enacted rule authorizing the sequestration of any lawyer appearing on behalf of more than one witness called to testify in an investigation.[1] Judge Bryant found that the SEC had failed to produce any "concrete evidence" of misconduct, a threshold which he deemed to be the minimum required to override the right of the witness to be represented by a particular counsel. See Administrative Procedure Act, 5 U.S.C. § 555(a). We agree. The record falls short of disclosing any reason for barring counsel selected by Csapo. Consequently, the order of the district court is affirmed.

In 1970 the Stirling Homex Corporation ("Homex") of Rochester, New York made its first public offering of stock after having operated for some years as a privately owned enterprise manufacturing modular housing units. Its success was both immediate and spectacular as the price of a share rose from the initial quotation of $16 to $52 within a matter of weeks. Unfortunately for all concerned, however, its demise was almost equally swift. In July 1972, barely two years after its entry into the public market, the company filed for bankruptcy under Chapter X of the Bankruptcy Act. Thousands of investors suffered losses aggregating many millions of dollars.

On July 25, 1972, the SEC launched a formal investigation to determine whether any insiders "have in connection with the purchases and sales of the securities of [Homex] made use of material corporate information concerning, among other things, the company's financial condition, business operations, and prospects before that information was generally made available to and known by the public." The Commission was particularly concerned that each of the public releases issued by the corporation during the period 1970 to 1972 optimistically portrayed its current financial position and confidently projected its continued prosperity.[2] Several individual shareholders expressed similar complaints in private class actions begun at this time.

There is no dispute that Frank Csapo was an important figure in the corporate life of Homex. As vice president for manufacturing, he had supervisory responsibility for

---

* Of the Second Circuit, sitting by designation pursuant to 28 U.S.C. § 294(d) (1970).

1. Rule 7(b) of the SEC's Rules Relating to Investigations provides:

    Any person compelled to appear, or who appears by request or permission of the Commission, in person at a formal investigative proceeding may be accompanied, represented and advised by counsel . . . provided, however, that all witnesses shall be sequestered, and unless permitted in the discretion of the officer conducting the investigation, no witness or the counsel accompanying any such witness shall be permitted to be present during the examination of any other witness called in such proceeding. 17 CFR § 203.-7(b).

    In practice, the presumption of the rule is reversed and few witnesses or their counsel are ever sequestered.

2. The SEC further claimed that each of the earnings reports prepared by the company during this period misleadingly indicated an increasingly profitable business. Csapo, however, insists that in March 1972, months prior to bankruptcy, Homex announced a substantial loss for the quarter ended January 31, 1972, based on unaudited figures.

the operation of the plant and was a permanent member of management's negotiating team. His compensation was, moreover, commensurate with his duties. He earned an annual salary of $50,000 and received in addition nearly 250,000 shares of Homex common stock, approximately 3% of the outstanding total.

On August 18, 1972, a subpoena *duces tecum* was served on the respondent directing him to produce, within one week, any documents in his possession or control relating to the finances, accounting practices or business affairs of Homex, as well as all records detailing his personal dealings in Homex securities. A covering letter to the subpoena informed respondent that if the requested papers were forthcoming his personal appearance would likely be unnecessary. Ten days later, Csapo retained Feldshuh's firm to represent him in SEC matters and paid an initial $5,000 fee. Csapo was Feldshuh's first Homex client.

Shortly thereafter, in response to the subpoena, Csapo submitted to the Commission seven items along with a statement that he had been unable to find any of the other materials sought. The documents provided were significant primarily for what they did not contain. Specifically, they made no mention of the fact that during the months of July and August 1972, Csapo had disposed of over 200,000 shares of Homex stock. This omission was revealed several weeks later when the staff, in the course of reviewing the information so far amassed regarding Homex and its officers, "uncovered" official forms which respondent had filed in the immediate wake of the sales as required by law.

The SEC thereupon sent Csapo a second letter on October 25, 1972, asking him to execute an affidavit clarifying the procedures which he had employed in complying with the subpoena. Instead, Csapo supplied the Commission with two photostat copies of relevant brokerage statements.

Still dissatisfied, the SEC notified Csapo on October 17, 1973 that he was to be questioned by its staff on November 7, 1973. The Commission further informed him that it would not waive its sequestration rule and that, accordingly, Feldshuh and Chernis, who had meanwhile represented eight other witnesses in the investigation, would be barred from the hearing room during the examination. Csapo, after first obtaining a short postponement of his scheduled appearance, wrote the SEC on December 14, 1973 that he would not consent to testify unless accompanied by his chosen counsel. Csapo expressed his belief that his interests would be severely prejudiced were he forced to rely on counsel less acquainted with the facts than Feldshuh and Chernis.

The SEC freely admits that its sequestration rule is only rarely applied. Nevertheless, it insists that its invocation is amply justified under the circumstances of this case. Both in the district court and on appeal, the Commission has relied on two interrelated propositions to support its action in excluding respondent's lawyers. The first is the presumption underlying the rule—that multiple representation increases the likelihood that subsequent evidence will be tailored, either consciously or unconsciously, better to conform with or explain what has come earlier. Of particular concern to the SEC is the fact that three of the other clients represented by Feldshuh and/or Chernis are principal targets of its investigation. They are: David Stirling, Jr., former chairman of the board and chief executive officer; William Stirling, former president, director and chief operating officer; and Harold Yanowitch, former general counsel, director and executive vice president. When called to testify, the Stirlings pleaded the Fifth Amendment. Yanowitch, on the other hand, answered the Commission's questions for some sixty hours but only after twice unsuccessfully attacking the sequestration rule here at issue. Both challenges were rebuffed as premature since the SEC had not yet made any attempt to exclude either Feldshuh or Chernis.

Second, the Commission argues that evidence already adduced suggests the possibility that the Stirlings and/or Yanowitch

may have attempted to pressure other employees of Homex to accept the services of Feldshuh and Chernis in order, the Commission fears, to present a "common front." Thus, Rubel Phillips, former vice president of Homex' Southern Division, told the SEC that he had been approached by Yanowitch who offered to provide him with an attorney. Although the subject was not explicitly discussed, Phillips stated that he had the definite impression that his counsel fees would be taken care of.

Carl Wren, former vice president for market research, similarly testified that Yanowitch had offered him the pre-paid legal services of Feldshuh and Chernis. To like effect, Edwin J. Schulz, another Homex officer, characterized as "essentially correct" a statement by his attorney that "Mr. Schulz was led to Mr. Feldshuh by Mr. Yanowitch." Moreover, Schulz personally stated that it was his "impression  .  .  . that Mr. David Stirling was picking up the bill."

Finally, Charles Marshall, a former director of Homex and former president of its wholly owned subsidiary, United States Shelter Corp., recounted a phone conversation with Feldshuh in which he portrayed the attorney as "rather insistent that he was representing me [as a defendant in a class action suit] and I was just as insistent that he was not."

On the basis of the foregoing,[3] the Commission petitioned the district court for enforcement of its subpoena. Feldshuh, vehemently disputing the SEC's factual allegations, requested an evidentiary hearing and the opportunity to inspect in their entirety the documents and transcripts referred to in part by the Commission. The SEC, however, insisted that the only question before Judge Bryant was whether it had acted arbitrarily in applying its regulation. The Commission argued that the actual truth or falsity of the evidence which it relied on was immaterial to a determination of the reasonableness of its reliance. Judge Bryant disagreed.

Unwilling to sully the reputation of Feldshuh and Chernis upon untested charges, and finding no "concrete evidence" of wrongdoing in the record as it stood before him, Judge Bryant conditioned Csapo's obligation to testify upon his right to be accompanied by counsel of his own choice. This appeal followed. Csapo has not yet appeared before the Commission.[4]

■ The validity of any application of the SEC's sequestration rule must be judged in light of the controlling language of Section 6(a) of the Administrative Procedure Act, 5 U.S.C. § 555(a), which provides that any person summoned to appear before a federal agency is entitled to the assistance of counsel. This guarantee, phrased by the legislature in unequivocal terms,[5] has been

3. The SEC has also made muted reference on appeal to the testimony of William McCann, chauffeur of David Stirling, who stated to the staff that he turned over to Yanowitch, in the presence of Feldshuh, a cigar box containing the check stubs of illegal political contributions. Feldshuh has denied the charge and furthermore, has secured the affidavits of three individuals, all of whom claim to have heard McCann state that he would be unable to recognize Feldshuh.

4. Just prior to oral argument, Csapo moved to dismiss the SEC's appeal as moot on the ground that the Commission's investigation terminated on July 2, 1975 with the entry of a consent judgment and permanent injunction against him. The SEC has advised us, however, that its investigation remains technically open and that further action, while not contem-

plated, is still possible. In any event, we believe that there are important public policy reasons for resolving at the present time the apparent conflict between the Commission's sequestration rule and the right to counsel guarantee of the Administrative Procedure Act. Most critically, we recognize that the delays inherent in appellate review, when juxtaposed against the length of the average investigation, will frequently "moot" the question before it can be decided. See *Roe v. Wade*, 410 U.S. 113, 125, 93 S.Ct. 705, 713, 35 L.Ed.2d 147, 161 (1973).

5. Compare the language of Section 6(c) of the Administrative Procedure Act, 5 U.S.C. § 555(c), which grants federal agencies the discretion, for good cause, to limit or condition the availability of its official transcripts.

construed to imply the concomitant right to the lawyer of one's choice. *Backer v. CIR,* 275 F.2d 141 (5th Cir. 1960); cf. *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932). The Commission's authority to disqualify attorneys under its rule is plainly inconsistent with that latter privilege and must, if it is to be enforced, be confined within "permissible limits." *SEC v. Higashi,* 359 F.2d 550 (9th Cir. 1966). Those limits have been exceeded in this case.

▮ We are of course mindful of the historical antecedents of the sequestration rule and of the important purposes which it is designed to serve. See *Torras v. Stradley,* 103 F.Supp. 737 (N.D.Ga.1951); *United States v. Smith,* 87 F.Supp. 293 (D.Conn. 1949). We do not question its utility in preserving the integrity of an investigation and recognize its practical necessity under certain circumstances. But we are not for that reason at liberty to ignore the clear congressional mandate referred to above. Thus, before the SEC may exclude an attorney from its proceedings, it must come forth, as it has not done here, with "concrete evidence" that his presence would obstruct and impede its investigation. *Cf. Great Lakes Screw Corporation v. NLRB,* 409 F.2d 375, 380–381 (7th Cir. 1969). Nor do we find anything to the contrary in *FCC v. Schreiber,* 381 U.S. 279, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965), heavily relied on by the Commission. Although the Court there counseled judicial restraint in interfering with the broad procedural powers delegated by Congress to the federal agencies, it nevertheless reaffirmed the responsibility of the courts to insure that administrative action is consistent with governing statutes and constitutional requirements, 381 U.S. at 291, 85 S.Ct. at 1468, 14 L.Ed.2d at 392.

Csapo's desire to be represented by Feldshuh and Chernis is both understandable and reasonable. He had retained them as his attorneys and paid them a $5,000 fee before they were contacted by any of his colleagues at Homex. In the intervening years they have acquainted themselves with the underlying facts and the complex corporate background to the events under investigation. Of equal importance to the witness, Csapo has confidence in them. Their replacement at this point would require further time and effort of new counsel at added expense to Csapo.

▮ We do not minimize the dangers inherent in counsel representing multiple clients in a single proceeding. It is at least plausible that as matters develop the best interests of Csapo may prove to be antagonistic to those of the Stirlings or Yanowitch. That decision, however, belongs to neither the district court nor the Commission. The SEC properly fulfilled its duty by informing those who came before it whether their lawyer had appeared on behalf of others and, if so, the possible conflicts which might arise. The choice must then be made by the witness after a full and frank disclosure by his attorney of the attendant risks. See ABA Code of Professional Responsibility, Disciplinary Rule 5–105(c). In a letter dated April 17, 1974, Feldshuh and Chernis repeated to Csapo their willingness to withdraw if he so desired, advised him that the staff "might look with some favor upon your appearance with other counsel," and indicated to him their intent to resolve any conflict of interest in favor of the Stirlings and Yanowitch. It was not the first time they had so warned the respondent. Nevertheless, Csapo replied, as he has throughout, that he wished to continue their services. Compare *In Re: Investigation Before the April 1975 Grand Jury,* 174 U.S.App.D.C. ——, 531 F.2d 600 (Decided February 3, 1976).

▮ The SEC would negate Csapo's informed and voluntary decision on the ground that "the objective of the investigation *might be frustrated* if Messrs. Feldshuh and Chernis . . . were permitted access to the testimony of any further witnesses." (Emphasis added.) We hold that such speculation is insufficient. The mere fact that a witness' counsel also represents others who have been or are later to be questioned, is no basis whatsoever for concluding that presence of such counsel would obstruct the investigation. On the contrary, in many cases it is likely that such

**12**

representation may facilitate and expedite the proceedings.

Our conclusion that the SEC has failed to sustain its burden is reinforced by the Commission's concession that Csapo is a potential target of its efforts and may therefore be subject to future criminal sanction. Since any statement made by Csapo during the course of his questioning may later be referred to the Department of Justice for future consideration by a grand jury, perhaps followed by an indictment and prosecution on criminal charges, Csapo's choice of counsel to accompany and advise him during his SEC interview is obviously a crucial one.[6] That choice should not needlessly or lightly be disturbed. In *SEC v. Higashi, supra,* the only other decision of a court of appeals to consider the question, the Ninth Circuit arrived at a similar accommodation of the competing interests of the Commission and its witnesses.

■ Certainly, the evidence of alleged solicitation presented to the SEC raised serious questions of possible professional impropriety which, if proved, might well warrant disciplinary action. Nothing in our opinion today is intended to limit the right of the SEC to institute itself such disciplinary proceedings or to refer the matter to the appropriate bar association. It is surely plausible, however, that the conduct of the Stirlings and Yanowitch, let alone that of Feldshuh and Chernis, may be innocently explained. It is neither unnatural nor unusual to provide the name of an attorney to a colleague in legal difficulty. Judge Bryant acted well within his discretion in proposing an evidentiary hearing to resolve these factual disputes. Cf. *In Re: Investigation Before the April 1975 Grand Jury, supra.*

In declining his invitation, the SEC argued that such collateral inquiries would delay and hinder its investigations. Analogizing its procedures to those of the grand jury, the Commission insists that speed is essential lest information become stale and useless or statutes of limitation expire. We find no merit in this contention for several reasons.

The SEC's admission that its sequestration rule is only rarely invoked belies any claim that the precedent established in granting Csapo a hearing would seriously disrupt its investigative function. Moreover, Csapo's right to representation under the Administrative Procedure Act will persist even if Feldshuh and Chernis were barred from his interview. Indeed, the Commission so advised him. It is inconceivable to us that a new attorney could become acquainted with the facts of the situation in the short period of time which the SEC asserts would be sufficient. Thus, delay would likely be increased by the substitution of counsel while Csapo would be put to the additional expense of retaining a new attorney.

We are similarly unpersuaded by the SEC's attempt to disparage the role of counsel at its proceedings and thereby to suggest that its action in excluding Feldshuh and Chernis may have inconvenienced Csapo but did not greatly disadvantage him. The Commission's own rules [7] provide that a witness' attorney may advise his client with respect to the right against self-incrimination, object to inquiries allegedly outside the scope of the investigation, and ask clarifying questions. Cf. *Hannah v. Larche,* 363 U.S. 420, 447 n.26, 80 S.Ct. 1502, 1517, 4 L.Ed.2d 1307, 1324 (1960). These responsibilities are of critical importance and their competent performance requires adequate preparation. In particular, intelligent exercise of the Fifth Amendment privilege demands both a knowledge of the underlying facts and an appreciation of their legal significance.

The order of the district court is accordingly affirmed without prejudice to the right of the SEC to renew its application if it is still of the view that Csapo's represen-

---

**6.** In fiscal 1974 the Commission referred 67 cases to the Department of Justice for possible prosecution. As a result, a total of 169 persons were named in 40 separate indictments.

**7.** See the SEC's Rules Relating to Investigations, 17 CFR § 203.7(c).

tation by Feldshuh and Chernis will impede its investigation and if it is willing to come forward with the requisite proof of its allegations. *Cf. In Re: Investigation Before the April 1975 Grand Jury, supra.*

*Affirmed.*