**UNITED STATES of America**

v.

**Norman TURKISH, Jules Nordlicht, Michael A. Kellogg, Frank Knell, Donald B. Conlin, Defendants.**

**No. 78 Crim. 251.**

United States District Court, S. D. New York.

Oct. 23, 1978.

Robert B. Fiske, Jr., U.S. Atty. for the Southern District of N.Y. by Paul Vizcarrondo, Jr., Asst. U.S. Atty., New York City, for the United States.

Squadron, Ellenoff, Plesent & Lehrer, New York City, for defendant Turkish.

Maloney, Viviani & Higgins, New York City, for defendant Kellogg.

Kaye, Scholer, Fierman, Hays & Handler, New York City, for defendant Nordlicht.

Guggenheimer & Untermyer, New York City, for defendant Knell.

Baer, Marks & Upham, New York City, for defendant Conlin.

## MEMORANDUM

VINCENT L. BRODERICK, District Judge.

### I.

Defendant Norman Turkish has moved for dismissal of the indictment against him

or for suppression of evidence, claiming that the attorneys who represented him in the investigatory phases of this case had a conflict of interest, that he did not waive any rights to object to the conflict, and that the government exploited the conflicted position of his prior attorneys.[1]

An evidentiary hearing was held before me on July 12 through 14, 1978. On the basis of the evidence (or lack thereof) adduced at the hearing, I have determined that defendant's motion should be denied. This memorandum sets forth the reasons for that denial.

## II.

In June, 1976 the New York County District Attorney initiated an investigation ("the investigation") into the Crude Oil Market on the Cotton Exchange.

1. Turkish does not allege violations of rights under the Fifth or Sixth Amendment to the United States Constitution because the actions complained of occurred prior to indictment.

 Consideration of Turkish's motion is premised upon the power of the court to enforce the Code through the court's supervisory power over members of the bar. *See Estates Theatres, Inc. v. Columbia Pictures Indus., Inc.*, 345 F.Supp. 93, 95 n. 1 (S.D.N.Y.1972), citing also Rule 5(f) of the General Rules of the United States District Court for the Southern District of New York. *See also NCK Org'n., Ltd. v. Bregman*, 542 F.2d 128, 129 n. 2 (2d Cir. 1976), and cases cited therein.

2. In January, 1977 customers of Bear Stearns, all of whom had their commodities accounts serviced by Turkish, were contacted by the District Attorney.

 At a meeting on April 8, 1977 attended by Turkish and his attorneys from Paul Weiss, the parties discussed the investigation. Martin Kleinbard, a Paul Weiss attorney, told Turkish that he thought there was no problem regarding Paul Weiss' multiple representation and that Paul Weiss could continue to represent Turkish and Bear Stearns and other Bear Stearns employees unless and until it was found that there was wrongdoing on someone's part; at that point, the problem of a conflict would have to be examined.

 A Paul Weiss attorney inquired of the District Attorney's Office, early in the investigation, whether the prosecutor saw any problem in its multiple representation, without apparent response. Paul Weiss attorneys also requested that the District Attorney's Office notify them promptly if, in the judgment of the assistant

Bear Stearns & Co. ("Bear Stearns") is a company which, *inter alia*, acts as broker and dealer in the trading of commodities futures. In connection with the investigation, a grand jury subpoena duces tecum was served upon Bear Stearns in August, 1976; the subpoena called for the production of certain records relating to trades in the Crude Oil Market.

Turkish is a limited partner of Bear Stearns, and he specializes in commodities futures. The law firm of Paul, Weiss, Rifkind, Wharton & Garrison ("Paul Weiss") was retained by Bear Stearns in August, 1976 and represented Bear Stearns and various Bear Stearns employees, including Turkish, throughout the investigations by the District Attorney and the United States Attorney's office.[2]

district attorneys, Paul Wiess' position became conflicted.

Turkish appeared for an interview at the District Attorney's Office in April, 1977 accompanied by Kleinbard, Neal Johnston, and Robert T. Smith, *attorneys from Paul Weiss*. Turkish was told by an assistant district attorney that he, among other persons, was a target of the investigation. One of the assistant district attorneys then reviewed certain ground rules which had been previously agreed upon with Paul Weiss: (1) no transcript would be made of *the interview*; (2) *any statement made by* Turkish would not be used against him at trial unless he took the stand, in which case inconsistent statements could be used to impeach him; and (3) the District Attorney could use any leads which Turkish might supply. The interview was conducted in conformity with *these ground rules.*

A week later Turkish again appeared at the office of an assistant district attorney accompanied by Kleinbard, Johnston and Smith. During this interview Turkish, in response to a question, gave the assistant district attorney the names of various registered representatives at Bear Stearns who had customers who traded in commodities. Turkish also gave information regarding his personal bank accounts. After the interview was completed, the assistant district attorney concluded (in an internal memorandum) that the District Attorney's Office should

1. arrange to interview all of the representatives of Bear Stearns who dealt in the commodity market;

2. obtain from Mr. Turkish information concerning dealings in Propane Gas by Bear Stearns; and

.

On April 13, 1978 indictments were filed against Turkish and others in New York County and in this court. The federal indictment charged him with conspiracy to defraud the United States, evasion of income tax and filing of false tax returns.

When Turkish was indicted, Paul Weiss suggested to him that he obtain new counsel and actively assisted him in a painstaking search, recommending to him, among others, the attorneys who represented him in making this motion.

The United States Attorney's Office used before the federal grand jury and plans to use at trial evidence obtained by the District Attorney, in addition to evidence obtained through its own investigation begun in February, 1978.

■ Turkish's motion arises out of the representation by Paul Weiss during the investigations not only of Turkish but also of Bear Stearns and other Bear Stearns employees. Turkish contends that the multiple representation violated Canon 5 and related rules of the American Bar Association's Code of Professional Responsibility (as amended 1976) ("the Code") in that Paul Weiss had a conflict of interest in its multiple representation.[3] He further contends that the District Attorney[4] and the government exploited his attorneys' allegedly conflicted position.

III

In the criminal context multiple representation is always troubling. After indictment the situations will be rare indeed

---

3. obtain Mr. Turkish's cancelled checks, bank statements, and saving bank book for the years 1974, 1975 and 1976.

After Turkish's first two interviews at the District Attorney's Office, that office continued, and the United States Attorney's Office later began, to obtain evidence against the defendant Turkish, to interview other persons employed by Bear Stearns and represented by Paul Weiss and to obtain documents from such persons.

In late January, 1978 Paul Weiss heard speculation from other Bear Stearns employees about possible wrongdoing by Turkish. Kleinbard discussed this with Turkish, who denied such wrongdoing.

On February 1, and February 2, 1978 Turkish was interviewed again by an assistant district attorney; again he was represented by Paul Weiss. On February 16, 1978 Turkish, represented by Paul Weiss, returned for a final interview at the Office of the District Attorney. At one of these meetings Assistant District Attorney Michel F. Baumeister, in the presence of attorneys from Paul Weiss, told Turkish that he did not believe Turkish was telling the truth and that he wanted the truth, even if it incriminated Turkish's superiors at Bear Stearns or persons at the Cotton Exchange. Baumeister then stated his view that since Paul Weiss represented Bear Stearns and other Bear Stearns personnel in addition to Turkish, Paul Weiss had a potential conflict of interest.

In February and March, 1978 it had become probable that Turkish would be indicted, and Paul Weiss attorneys advised him that if he could give testimony against anyone else at Bear Stearns or the Cotton Exchange, it would be advisable to do so. Turkish replied that he had done nothing improper and knew of no criminal activity by anyone else.

Between then and the date the indictment was returned in this case Paul Weiss continued to represent Turkish. During this period Paul Weiss also represented other Bear Stearns employees who testified before the state and federal grand juries.

3. Paul Weiss filed a memorandum on August 2, 1978 in which it presented its position that 1) there was at no time a conflict of interest in his representation of Turkish and Bear Stearns and other Bear Stearns employees because the interests of Turkish and Bear Stearns were identical; and 2) Turkish intelligently consented to the multiple representation.

4. The government argues that dismissal of the indictment would be inappropriate even if there were improper conduct by the District Attorney because "[t]his Court's supervisory power should not be used to exclude the fruits of state conduct over which it has no supervisory authority and where the propriety of the conduct under state law will not be affected by the exclusion." Government's Post Hearing Memorandum in Opposition to the Defendant's "Conflict of Interest" Motion, filed August 3, 1978, at p. 26. The government misperceives the scope of the supervisory authority of this court. The authority and obligation of the district court to supervise the conduct of the government extends to all conduct in relation to an action prosecuted in this court, even if the conduct complained of was that of state, not federal, officials. This is especially appropriate in the case before me, where the United States Attorney's Office has represented that it has access to and will use at trial evidence collected by the District Attorney's Office.

where conflict of interest does not exist, whether or not it has yet become apparent. *See, e. g., Salomon v. LaVallee,* 575 F.2d 1051, 1053 (2d Cir. 1978), "the perils of joint representation for co-defendants at trial have become increasingly clear." Before indictment the potential for conflict is always there although identification of the areas of potential conflict may be considerably more difficult since precise charges are not available to pinpoint those areas.

Judicial scrutiny in the criminal context of multiple representation by attorneys, and of conflict or potential conflict of interest in connection therewith, has been focussed to date on the stages of 1) pre-indictment grand jury investigation and 2) trial. Judicial attention has generally been directed to multiple representation of witnesses before grand juries by prosecutors who claim that such representation impedes the grand jury's investigation. *See, e. g., In re Taylor,* 567 F.2d 1183 (2d Cir. 1977). In the trial stage the issue has been raised by defendants, who claim that conflicts in multiple representation situations have deprived them of the effective assistance of counsel, (*Salomon v. LaVallee, supra; United States v. Carrigan,* 543 F.2d 1053 (2d Cir. 1976); *United States v. Mari,* 526 F.2d 117 (2d Cir. 1975), *cert. denied,* 429 U.S. 941, 97 S.Ct. 359, 50 L.Ed.2d 311 (1976)), and by appointed counsel who protest that they cannot effectively represent multiple defendants in a criminal trial (*Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978).

 With respect to post-indictment situations certain procedures have evolved and are still evolving. While a person in a criminal context is entitled to counsel of his choice (*United States v. Sheiner,* 410 F.2d 337, 342 (2d Cir.), *cert. denied,* 396 U.S. 825, 90 S.Ct. 68, 24 L.Ed.2d 76 (1969)), the court is required to ascertain, when more than one defendant is represented by the same counsel, "whether a conflict exists to the degree that a defendant may be prevented from receiving advice and assistance sufficient to afford him the quality of representation guaranteed by the Sixth Amendment." Each defendant is to be "fully advised by the trial court of the facts underlying the potential conflict and be given the opportunity to express his views." *United States v. Carrigan, supra,* 543 F.2d at 1055. If, after being advised, a defendant opts to continue with the joint representation, he bears the burden, in a post-trial challenge, to show that prejudice has resulted. If there has been no inquiry, the government bears the burden of showing that there was no prejudice. *Salomon v. LaVallee, supra,* 575 F.2d at 1055.

In the grand jury investigation phase, problems surface less frequently, and the evolution of ground rules has been less obvious. The Court of Appeals for this Circuit has suggested the applicability of the post-indictment procedures to problems which arise in the grand jury context. *See In re Taylor, supra,* 567 F.2d at 1186.

As one regresses from the trial context through grand jury investigation to the initial stages of a prosecutor's investigation, resort to a court for assistance and guidance becomes more difficult. No charges have been formulated, the direction the investigation is to take may not have been charted, and, so far as persons touched by the investigation are concerned—clients and counsel alike—the guideposts may be scarcely visible. Is it a serious investigation? What information does the prosecutor have? What is he after? Whom is he after? Is there any reason to be concerned? How concerned? Resort may be had to the prosecutor to seek answers to these questions, but most will probably remain unanswered because the prosecutor is unwilling, or perhaps more often unable, or perhaps both, to respond.

Often persons called by a prosecutor in the initial stages of an investigation do not seek counsel, when they would have been well advised to do so. Where several have been summoned they may seek joint counsel. Expense will invariably be a factor—obviously joint representation is more economical. If those summoned in the investigation work for an entity, the entity may retain counsel to represent itself and its

employees and officers, as did Bear Stearns herein. If the investigation comes to naught this works out well; if the investigation culminates in indictment of some of those jointly represented hindsight often—perhaps almost invariably—indicates that separate representation from the outset would have been advisable.

But in the initial stages of an investigation, who is to catalyze consideration of the possibility of separate representation for those who are called or interviewed? The individuals who are jointly represented know what they did and did not do, but they may not know the importance of individual representation. The jointly retained attorney, if he is experienced in criminal matters—often he is not—may well believe that individual representation from the outset is advisable. But he knows only what he has been told by the individuals he represents, and if any of the individuals has done or omitted to do things which may expose such an individual to indictment, the chances are very good that he will not inform counsel—particularly if the jointly retained attorney is being paid by the individual's employer. The prosecutor in the early stages of an investigation may have no idea where, or to whom, the investigation will lead. Until grand jury proceedings begin there is no judge related to the matter who can act as a catalyst.

Constitutional rights are, to be sure, not violated by multiple representation of those called in the early stages of a criminal investigation, but if the investigation ultimately culminates in the indictment of one or more, but less than all, of those jointly represented, those indicted may turn out to have been less than adequately represented. A catalyst is needed to alert those threatened by the criminal process to the need for individualized, and independent, representation. With no judge involved the only possible catalysts are the attorney retained on a multiple representation basis and the prosecutor.

### IV

Multiple representation and potential problems associated therewith are ad-dressed under Canon 5 of the Code, which mandates "Exercise [of] Independent Professional Judgment on Behalf of a Client." Disciplinary Rule 5–105 instructs that a lawyer should decline employment or should cease multiple employment "if it would be likely to involve him in representing different interests . . . [unless] it is obvious that he can adequately represent the interest of each [client] and . . . each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each." *See also* A.B.A. Standards Relating to the Defense Function 3.5 (Approved Draft, 1971); Code Ethical Considerations EC 5–14 through 5–20.

The Code recognizes that "[w]hether a lawyer can fairly and adequately protect the interests of multiple clients . . . depends upon an analysis of each case. In certain circumstances, there may exist little chance of the judgment of the lawyer being adversely affected by the slight possibility that the interests will become actually differing . . . ." EC 5–17. *See also Holloway v. Arkansas, supra,* 435 U.S. at 482, 98 S.Ct. at 1178, "[I]n some cases multiple defendants can appropriately be represented by one attorney; indeed, in some cases, certain advantages might accrue from joint representation."

█ That multiple representation may be appropriate does not excuse defense counsel from raising the question of a possible conflict with the clients involved in the multiple representation. The clients then may object or consent to the multiple representation.

The Supreme Court has held, in connection with waiver of one's Sixth Amendment right to effective assistance of counsel, that "determination of whether there has been an intelligent waiver . . . must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82

L.Ed. 1461 (1938). These factors are appropriate also in determination of whether a client has consented to multiple representation.

Paul Weiss attorneys were called as witnesses at the hearing on Turkish's motion to dismiss, but Paul Weiss itself was not a party and hence did not participate in the examination of witnesses or in the presentation of evidence. I make no finding, therefore, with respect to whether Paul Weiss' representation during the investigation accorded with the requirements of Disciplinary Rule 5–105, except to note that I have not found, and counsel have not drawn my attention to, any cases in which the question of multiple representation in the course of the initial stages of a criminal investigation has attracted judicial scrutiny.[5]

The Code can also be read to place responsibility upon the prosecutor with respect to multiple representation in a criminal investigation. Canon 1 imposes upon every lawyer—this would include prosecutors—the duty to "Assist in Maintaining the Integrity and Competence of the Legal Profession." Violation of DR 5–105 constitutes a violation of Disciplinary Rule DR 1–102(A), which provides that "A lawyer shall not Violate a Disciplinary Rule." Under Disciplinary Rule 1–103(A), "[a] lawyer possessing unprivileged knowledge of a violation of DR 1–102 shall report such knowledge to a tribunal or other authority empowered to investigate or act upon such violation."[6] *See also Estates Theatres, Inc. v. Columbia Pictures Indus., Inc., supra,* 345 F.Supp. at 98.

In the situation where an indictment has been filed, the case is then before a court, and if a defense counsel is involved in multiple representation in apparent violation of DR 5–105, the government must notify the court. *See* DR 1–103(A). Where no indictment has been filed and the conduct is not in connection with an appearance before a grand jury, recourse to the court is difficult. And since there is an active criminal investigation under way, it is also difficult to identify any appropriate "other authority empowered to investigate or act upon such violation"—the secrecy which a criminal investigation requires might prevent recourse to any grievance committee.

■ In most instances, the prosecutor will not know whether or not defense counsel has raised with his clients the conflict problem. He therefore will not know whether DR 5–105 and so DR 1–102 have been violated and whether it is necessary to alert the client. Some supplemental procedure is necessary to anticipate—and to provide against—conflicts of interest which may inhere where there is multiple representation of those called in connection with a pre-grand jury criminal investigation. In such situations, in my judgment, the prosecutor should initially raise the question of the danger of conflict of interest in connection with multiple representation with the attorney who represents several clients and, if that does not prove fruitful, with the clients themselves.[7] *See, e. g., Securities & Exchange Com'n. v. Csapo,* 174 U.S.App. D.C. 339, 343, 533 F.2d 7, 11 (1976) (Lumbard, J., sitting by designation): "The SEC properly fulfilled its duty by informing those who came before it whether their lawyer had appeared on behalf of others and, if so, the possible conflicts which might arise."

---

5. Paul Weiss filed a post-hearing memorandum (*see* fn. 3, *supra*) after requesting and receiving permission to do so. It was necessarily directed, however, to a record which it played no part in making.

6. The reporting directive of DR 1–103(A), like the requirements of all Disciplinary Rules, is "mandatory in character." ABA Code of Professional Responsibility (as amended 1976), Preliminary Statement.

7. Although DR 1–103(A) does not by its term contemplate a report to the client, the policy of the Rule would be effectively implemented by this procedure. While not a "tribunal or other authority empowered to investigate or act", the client makes the ultimate decision whether or not to retain his attorney despite a potential conflict. *See In re Taylor, supra,* 567 F.2d at 1191. This procedure would in most instances obviate any necessity for recourse to a formal tribunal or authority.

The prosecutor's action or actions should be memorialized in written memoranda. If he has contact with the clients, it should if possible take place in the presence of the clients' attorney.[8] Moreover, the prosecutor should limit the communication to the clients to raising the prospect of a conflict of interest and should refrain from discussing the subject matter of the representation.[9]

V

■ In the case at bar, the prosecutor made no overtures to Turkish suggesting the possibility of conflict until February, 1978, some 20 months after the investigation began, and 10 months after Turkish had first been interviewed by that office and had been notified that he was a target of the investigation. In Paul Weiss' presence Assistant District Attorney Baumeister told Turkish that he believed that Paul Weiss, in representing not only Turkish but also Bear Stearns and other Bear Stearns personnel, had a potential conflict of interest.

However, the failure by the prosecutor earlier to raise the conflict problem with Turkish is not grounds, in the context of this case, for the dismissal or suppression sought by Turkish.

Turkish is an intelligent, experienced individual who goes about the selection of lawyers very carefully. Although Paul Weiss was retained by Bear Stearns, Turkish had had prior experience with that law firm: Kleinbard of Paul Weiss, who worked on the Bear Stearns and Turkish representations in connection with the Crude Oil investigations, had previously been retained by Turkish to represent him in a personal matter. Turkish knew very well that Paul Weiss would be representing Bear Stearns and other Bear Stearns officers and employees. He knew that Paul Weiss' posture in the representation would be one of cooperation with the District Attorney's Office since he was consulted with respect to, and participated in the adoption of, that posture. At that stage both Turkish and Bear Stearns denied (as Turkish does today) any knowledge of wrongdoing. Bear Stearns acted in the Crude Oil Market only through Turkish, and both were professedly interested in seeing the District Attorney's Office educated in the intricacies of commodities trading in general and the Crude Oil Market in particular so that its representatives would be persuaded that there was no wrong-doing and would go away.

There was no evidence submitted at the hearing of actual conflict of interest. To the extent that there was a potential conflict of interest, I find Turkish was aware of it. He chose to continue to have Paul Weiss represent him, thereby waiving any objection he might have to that representation.

No evidence was offered at the hearing before me of any specific damage which has been suffered by Turkish as the result of the multiple representation. Thus there was no evidence that the District Attorney (or the government) has received information which it would not otherwise have re-

---

8. Disciplinary Rule 7–104 prohibits an attorney, here the prosecutor, from "[c]ommunicating . . . on the subject of the representation with a party [here the client] he knows to be represented by a lawyer in that matter *unless* he has the prior consent of the lawyer representing such other party or is authorized by law to do so." (emphasis added). The contact with the client suggested here, to be had if possible in the presence of the client's counsel, should in any event be construed to fall within an exception to the prohibition of DR 7–104, for the reasons set forth above. *See Securities and Exchange Com'n. v. Csapo, supra,* 174 U.S.App.D.C. at 343, 533 F.2d at 11.

9. The government, by conscientiously and consistently raising the question of potential conflict when it is aware of multiple representation, will undermine possible subsequent defense applications which use a conflict argument "for purely strategic purposes." *See Allegaert v. Perot,* 565 F.2d 246, 251 (2d Cir. 1977), *quoting* Judge Van Graafeiland in *Lawyer's Conflict of Interest—A Judge's View* (Part II), N.Y.L.J., July 20, 1977 at 1, col. 2.

I note also the government's vigor in raising problems with multiple representation when it feels it is being "stonewalled." *See In re Taylor, supra.* The government should not object to assumption of this duty in all instances.

ceived, nor that Turkish followed a course of conduct during the pre-indictment stage which he would not otherwise have pursued. There is no evidence that Paul Weiss represented him otherwise than it would have represented him if he had been its only client.