UNITED STATES of America, Plaintiff,

v.

Anthony J. MIERZWICKI, Defendant.

Crim. No. JH–80–0152.

United States District Court,
D. Maryland.

Nov. 6, 1980.

Russell T. Baker, Jr., U.S. Atty. for the State of Maryland, Edward M. Norton, Jr., and Stephen J. Immelt, Asst. U.S. Attys., Baltimore, Md., for plaintiff.

Allen L. Schwait, Paula M. Junghans, and Garbis & Schwait, P.A., Baltimore, Md., for defendant.

## MEMORANDUM AND ORDER

HOWARD, District Judge.

Pending before the Court in this income tax evasion case is the defendant's Motion to Quash Indictment and to Suppress Evidence. Because of the novelty of this matter, the Court will present a somewhat detailed account of the factual and procedural background of this case.

### I. *Factual and Procedural Background*

On April 8, 1980, Anthony J. Mierzwicki was indicted on six counts of income tax evasion and filing false tax returns. The indictment alleged that Mierzwicki underre-

ported his income for the 1973, 1974 and 1975 tax years. The defendant allegedly failed to report kickbacks he received for awarding painting contracts to Charles J. Muffoletto.

In 1969, Mierzwicki was hired as a manager of residential apartments by Monumental Properties, Inc.; his duties included supervising the maintenance of several thousand apartment units. In 1971, Muffoletto, a self–employed painting contractor, began to bid on painting jobs for Monumental. Shortly after Muffoletto began contracting with Monumental, he began to bestow gratuities upon Mierzwicki. These ranged from initial gifts of whiskey and small amounts of cash to alleged payments of about $10,400, $8,800 and $6,400 in 1973, 1974 and 1975, respectively.

On February 24, 1977, Muffoletto was interviewed by Special Agent Paul W. Miller of the Intelligence Division of the Internal Revenue Service ("IRS"). Agent Miller informed Muffoletto that he was under investigation for failing to report all of his income on his 1973 through 1975 tax returns. As the interview progressed, "Muffoletto stated that he was becoming . . . upset . . . and that perhaps he should see his lawyer, Dave Preller, before continuing the interview." Defendant's Hearing Exhibit 1 (Memorandum of Interview, dated February 24, 1977) at 4.

The following day, Muffoletto executed a power of attorney appointing Bernard S. Aiken (an attorney) and Donald B. Greenberg (an accountant) as attorneys–in–fact to represent him before the IRS; the power of attorney was received in the Baltimore office of the IRS on March 4, 1977. Government Hearing Exhibit 4.

On April 18, 1977, Mierzwicki filed amended returns for the 1973, 1974 and 1975 tax years; these returns reported the payments he had received from Muffoletto. Subsequently, on April 29, 1977, Agent Miller placed a telephone call to Greenberg during which he indicated to Miller that an unnamed individual was involved in the matter. Government Hearing Exhibit 4 (Memo of telephone conversation, April 29, 1977).

On May 6, 1977, during a meeting with Agent Miller, Greenberg revealed Muffoletto's payments to Mierzwicki and other details of the kickback scheme. In June, Special Agent William Prochownik took over the Muffoletto investigation. Almost three months later, on August 29, Prochownik interviewed Mierzwicki, advised him of his right to representation by an attorney, and questioned him about the kickback allegations; Mierzwicki indicated he wanted the· advice of counsel and the interview was terminated.

Approximately two weeks later, on September 14, Mierzwicki designated David Preller and George Christian as his attorneys–in–fact to represent him before the IRS. On December 22, during a recorded IRS interview, Mierzwicki acknowledged the receipt of "commissions" from Muffoletto; at this interview, Prochownik learned that David Preller represented Muffoletto in certain civil matters.

On January 20, 1978, Prochownik initiated the formal investigation of Mierzwicki. Subsequently, on March 10, Muffoletto was interviewed by Prochownik; also present were Greenberg, Aiken and Preller. Prochownik conducted a similar interview with Mierzwicki on April 6, at which he was represented by Christian and again acknowledged the receipt of payments from Muffoletto.

On January 2, 1979, Muffoletto was indicted for income tax evasion. . Mierzwicki subsequently revoked the power of attorney of Preller and Christian and designated his current counsel to represent him before the IRS. On March 1, Muffoletto entered into a plea agreement with the government, and he pled guilty pursuant to that agreement on March 13, 1979. On May 10, 1979, Muffoletto was sentenced.

On October 29, 1979, Mierzwicki's current counsel met with representatives of the Tax Division of the Justice Department. At that meeting, the defendant's attorney indicated that Mierzwicki had received far less from Muffoletto than was reported on the defendant's amended returns. Groff Affidavit at 3. The matter of Preller's repre-

sentation of both Muffoletto and Mierzwicki was discussed at that time.

On April 12, 1980, Mierzwicki was charged, in a six–count indictment, with violations of 26 U.S.C. §§ 7201 (income tax evasion) and 7206(1) (wilfully subscribing to false tax returns). On May 14, 1980, the defendant filed this Motion to Quash Indictment; the motion was filed *ex parte* in an attempt to avoid the waiver by the attorney–client privilege.

In deference to the defendant's concern, the Court sealed the motion pending its resolution of the privilege issue. At a conference on July 3, the defendant's counsel agreed to serve his motion on the government. An evidentiary hearing on the motion was held on July 17, 1980.

## II. *Discussion*

### A. *Waiver of the Attorney–Client Privilege*

The defendant adopted extraordinary procedures in filing his *ex parte* motion because of his unwillingness to waive the attorney–client privilege with respect to his amended returns and communications between him and Preller. As will become apparent, the defendant had waived this privilege prior to filing his *ex parte* motion.

Any examination of the attorney–client privilege should begin with the observation that privileges are not favored in the law and are seen as a hindrance to litigation. *See* McCormick, Evidence § 77 at 156 (2d Ed.) (privileges serve only to "shut out the light"), and Weinstein & Berger, Evidence ¶ 503[02] at 503–15 (courts have insisted on narrow construction of privilege). Mierzwicki's claims of privilege are vulnerable on several bases:

1) Prior disclosure;

2) Amended returns are not confidential statements within contemplation of the privilege;

3) Supposedly privileged matter has been injected into the case; and

4) The defendant has impugned the good faith of his counsel.

It is fairly well established that disclosure of a privileged communication is a waiver of the privilege. *See In Re Weiss,* 596 F.2d 118 (4th Cir. 1979). Accordingly, statements made by Mierzwicki in the IRS interviews of August 29 and December 12, 1977, and April 6, 1978 are not shielded by the attorney–client privilege.

Additionally, statements made by counsel, acting on defendant's behalf, may be deemed waivers of the privilege. The uncontested affidavit of Joseph H. Groff, Justice Department Tax Division lawyer, indicates that he met with the defendant's attorney, Allen Schwait, who disclosed that amended returns were filed by the defendant on advice of former counsel. Schwait apparently went into some detail in outlining the content of the consultations between Preller and the defendant.[1]

Although the attorney–client privilege is personal to the client, it may be waived by counsel acting with the authority of the client. McCormick, Evidence § 93 at 194. This waiver is not restricted to words or conduct expressing an intent to relinquish a known right, but may be by conduct which would make maintenance of the right unfair. *Id.* Thus Mierzwicki's authorization of Schwait to deal with the Justice Department to effect a favorable conclusion of the investigation may be deemed a waiver of the privilege with respect to disclosures by Schwait.

Although the defendant maintains that his amended tax returns should be excluded, the returns are not confidential statements within the contemplation of Fed.R.Evid. 501. A confidential communication is one "not intended to be disclosed to third persons other than" counsel. Weinstein & Berger, *supra,* at 503–11.

It would require imaginative reasoning to argue that defendant's amended tax returns were not intended for disclosure to third parties. Indeed, such reasoning would be contrary to authority. *See, e. g., United States v. Schoeberlein,* 335 F.Supp. 1048

---

1. Groff began the interview with Schwait with the warning that Schwait's testimony would be considered by the government as vicarious admissions by the defendant.

(D.Md.1971) (information intended to be disclosed on tax forms not protected by attorney–client privilege), and *United States v. Cote*, 456 F.2d 142 (8th Cir. 1972) (disclosure, on amended returns, waives privilege with respect to data on returns *as well as underlying data*). Nor may Mierzwicki claim that his communications with Christian, who prepared the amended returns, are privileged; no accountant–client privilege is recognized by the Court in this federal tax case.[1a] In light of the strong policy reasons for restricting claims of privilege, the common law rule will be followed. *See* Weinstein & Berger, Evidence ¶ 503(a)(3)[01] at 503–24. To be privileged, such communications must come within the protection of the attorney–client privilege (accountant must be a "representative of a lawyer").

■ As Christian's assistance was apparently limited to the preparation of the amended returns, under the rationale of *Schoeberlein* and *Cote, supra*, no privilege attaches to either the returns, underlying documentation, or testimony thereon. Accordingly, no privilege may be claimed with respect to the returns which were submitted to the IRS.[2]

■ The defendant seeks to explain the additional income reported on his amended returns by his reliance on Preller's advice. It is well established that when confidential communications are made a material issue in a judicial proceeding, fairness demands treating the defense as a waiver of the privilege. *See United States v. Aronoff*, 466 F.Supp. 855, 861 (S.D.N.Y. 1979) (collects cases and other authorities). Thus, Mierzwicki's reliance on a defense that his returns were amended on advice of counsel is a waiver of the attorney–client privilege with respect to that advice.

Finally, the defendant has raised Preller's professional conduct as a basis for either quashing the indictment or excluding evidence. *See* defendant's *ex parte* Motion to Quash Indictment, etc. at 11 ("prohibition against conflicting representation was violated in the case at bar"), at 12 (there was "no real investigation or preparation of the case" on Mierzwicki's behalf), and at 14 (Preller's advice deviated from standard of "experienced practitioners in criminal tax field").

■ By his accusations about Preller's competence and representation of a client with competing interests, Mierzwicki has waived the attorney–client privilege with respect to evidence about Preller's advocacy of the defendant's interests. *See Tasby v. United States*, 504 F.2d 332 (8th Cir. 1974) (attack on attorney's competence waives privilege), McCormick, Evidence § 91 at 191 (2d Ed.) (whenever client makes imputation against good faith of lawyer, privilege waived to extent required to permit lawyer to protect himself; conflict need not involve actual litigation between lawyer and client); Disciplinary Rule 4–101 *cited in* Weinstein & Berger, Evidence ¶ 503(d)(3) [01] at 503–62 ("A lawyer may reveal . . . confidences or secrets necessary to . . . defend himself . . . against an accusation of wrongful conduct.")

Thus, none of the defendant's claims of privilege supports the relief he seeks.

B. *The Government's Failure to Warn Mierzwicki of the Consequences of Preller's Representation of Muffoletto and The Defendant*

The defendant contends that the government breached its duty to inform him of the possible prejudice resulting from his attorney's representation of another client who was also a target of a IRS investigation.

---

**1a.** Although the Maryland legislature has enacted a statutory accountant-client privilege, Md.Code Ann., Cts. & Jud.Proc. § 9–110, the application of that privilege in this federal income tax prosecution is unwarranted. *Cf. Lewis v. Capital Mtg. Investments*, 78 F.R.D. 295, 313 (D.Md. 1977) (District Court declined to recognize statutory accountant-client privilege in federal question case).

**2.** As the returns were filed before knowledge of the claimed multiple representation was evident to any government attorney, and because the IRS case agents had no reasonable basis for discerning a conflict, the amended returns are not excludable on any basis defendant has raised.

This duty is said to be found in the Code of Professional Responsibility and in IRS administrative regulations. *Compare, United States v. Turkish,* 470 F.Supp. 903 (S.D. N.Y.1978) (Code of Professional Responsibility imposes a duty on the prosecutor to warn the client of dangers inherent in multiple representation situations) *with United States v. Feaster,* 494 F.2d 871 (5th Cir. 1974) (IRS regulations impose an obligation on the government to determine whether its client is aware of implications of multiple representation). The defendant maintains that the government improperly exploited the attorney's conflicting interests and suggests, as an appropriate cure, an order either quashing the indictment or suppressing certain evidence.

### 1. Implications of the Code of Professional Responsibility

In *Turkish,* a criminal investigation of commodities traders, the district court noted the troublesome aspects of multiple representation in criminal investigations, 470 F.Supp. at 906, and took notice of the practical difficulties in monitoring multiple representation at the early or pre–indictment stages of an investigation. Consequently the Court emphasized the necessity that defense counsel and the prosecution adhere to the Code of Professional Responsibility[3] to prevent conflicts. *Id.,* 907–10.

The court in *Turkish* noted that "[i]n some cases multiple defendants can appropriately be represented by one attorney; indeed, in some cases, certain advantages might accrue from joint representation." *Holloway v. Arkansas,* 435 U.S. 475, 482, 98 S.Ct. 1173, 1177, 55 L.Ed.2d 426 (1978), *cited in Turkish, supra* at 908.

For example:

The clients can maintain a united front more easily if all are represented by one attorney than if each is represented separately. A single attorney representing all clients can act as the funnel through which flows all communication among the clients and with the prosecutor. Maintaining a united front with separate representation is possible only if each attorney and his client knows who the other attorneys are and trusts that they will cooperate. But with separate representation, no attorney can be certain that he has received from other counsel all information that he thinks necessary to evaluate his single client's position. And unless an attorney believes that he is receiving complete information from the other attorneys, he must weigh the risks of noncooperation with the prosecution differently than he might if he controlled all communication among the targets and witnesses and with the prosecutor. Game theory is instructive. Studies suggest that imperfect communication among those faced with possible jeopardy pressures each to seek and to settle for less than he might have obtained if all had cooperated.

Tague, *Multiple Representation of Targets and Witnesses during a Grand Jury Investigation,* 17 Am.Crim.L.Rev. 301, 313 (1979).

Three principal advantages of multiple representation have been cited:

[I]t may contribute to the termination of the investigation, it may cause the government to aid one or more of counsel's clients in a way it would not have if each had been separately represented, or it may result in governmental disclosure of valuable information about the direction of the investigation and the status of the clients.

*Id.,* at 310.

Although there is a growing, if not coherent, body of authority on the respective roles of defense counsel and prosecution, there is little guidance on the proper role of administrative agency personnel in possible conflict situations.

---

**3.** The Code of Professional Responsibility is statutory law in Maryland, Md.Ann. Code, Vol. 9C, Appendix F. The Code of Professional Responsibility is made applicable to practitioners before this Court by Local Rule 2A.

Under *Turkish,* the defense attorney's duty is found in Disciplinary Rule 5–105: lawyer should decline or cease representation likely to involve different interests unless it is obvious lawyer can adequately represent interests of each client. 470 F.Supp. at 908. The prosecution's duty is found in DR 1–102: lawyer has duty to report violations of disciplinary rules. *Id.* at 909.

In this case, Agent Prochownik, who conducted the investigation of, and initiated the charges against, Mierzwicki, has no legal training; thus it would be inequitable to hold him to the Code of Professional Responsibility even in the presence of clear indications of prejudicial multiple representation.

Of course, prejudicial multiple representation was not apparent in the instant case. The day after Muffoletto indicated Preller was his attorney, Muffoletto appointed Greenberg and Aiken as his attorneys–in–fact; by executing the power of attorney, Muffoletto explicitly revoked all prior designations of legal representatives before IRS. Subsequently, Mierzwicki appointed Preller and Christian his attorneys–in–fact. The effect of these powers of attorneys was to remove any representational conflict with which Agent Prochownik could be charged with knowledge.

Clearly, there was some indication of a possible conflict prior to Mierzwicki's indictment on April 12, 1980. Preller's presence at the Mierzwicki interview (December 22, 1977) and the Muffoletto interview (March 10, 1978), should have alerted any involved government attorney to the possibility of a multiple representation problem. Preller's presence at those two interviews, however, does not provide a basis for the defendant's requested relief.

Mierzwicki's amended tax returns, filed April 18, 1977, were corroborated by Muffoletto's admissions through Greenberg on April 29, 1977. Thus, the government's case against the defendant was made more than one year before the date by which any government attorney could be fairly charged with knowledge of a possible representational conflict.[4]

### 2. Implications of IRS Internal Procedures

In *Feaster, supra,* an income tax evasion case somewhat similar to this one, the Fifth Circuit found an IRS duty to determine whether the attorney representing clients with conflicting interests had complied with the IRS disclosure regulations. 494 F.2d at 875. The Court held that statements of the unindicted client were not to be suppressed. The defendant has speculated that a different result would have been obtained had Feaster attempted to suppress his own statements made in the absence of an IRS exploration of a possible conflict.

That speculation ignores the Court's straightforward conclusion that such conduct by the government is not an adequate basis for excluding the statements. 494 F.2d at 876.

The defendant has proffered a recent Internal Revenue Manual supplement (9G–117, May 5, 1980) which establishes procedures and guidelines by which IRS personnel are to handle multiple representation situations. Relevant portions provide:

§ 10.29 Conflicting Interests

No attorney, certified public accountant, or enrolled agent shall represent conflicting interests in his practice before the Internal Revenue Service, except by express consent of all directly interested parties after full disclosure has been made.

\* \* \* \* \* \*

Section 3. Procedures

.01 Interview of Witness

1 Upon learning that counsel represents both the taxpayer under investigation (or other interested party) as well as the summoned witness, the interviewing officer should give consideration to exploring with the attorney, prior to the interview of the witness whether or not the attorney realizes that his representation of both the subject of the investigation and the witness may occasion a conflict of interest.

2 If, after discussing the potential conflict of interest situation with the attorney the question of dual representa-

---

4. The Court does not condone, and questions the propriety of, Preller's negotiation of a plea bargain for Muffoletto after his appearance as counsel for Mierzwicki.

tion is not resolved, at the outset of the interview of the witness and during the proceedings, the interviewing officer should consider whether the potential conflict of interest makes it appropriate to explore the issue with the witness. If, in the opinion of the interviewing officer the question of dual representation should be pursued, he/she should ask the following of the witness:

\* \* \* \* \* \*

d Did the attorney tell you that he also represents the taxpayer?

e Did the attorney tell you that he is being paid by the taxpayer (or some other person)?

f Do you realize that there is a potential conflict of interest?

\* \* \* \* \* \*

.02 Obstruction of Interview

1 If the interviewing officer has reason to anticipate that an attorney will improperly impede or obstruct the questioning of a witness, he/she should consult with District Counsel prior to the interview with respect to the manner of conducting the questioning.

Internal Revenue Manual Supplement, May 5, 1980 at 1–2.

 From the above–cited manual portions and Agent Prochownik's testimony, it is clear that the regulations were adopted to remove impediments from the conduct of IRS investigations. Even assuming a breach of this internal procedure, which was not in effect during the Mierzwicki investigation, the defendant has not suffered an injury to an interest protected by the procedure; accordingly, any deviation from that procedure is not a basis for the relief the defendant seeks. *Cf. In Re Grand Jury Subpoenas April 1, 1978,* 581 F.2d 1103, 1108 n. 10 (4th Cir. 1978) (target not entitled to IRS adherence to any particular internal policy with regard to decision to initiate grand jury investigation).

III. *Conclusion*

For the foregoing reasons, the relief the defendant seeks should not be granted.

SO ORDERED.